## UNIVERSAL OIL PRODUCTS CO. *v.* ROOT REFINING CO.

Nos. 48 and 64.   Argued October 15, 1945.—Decided June 10, 1946.

*Ralph S. Harris* argued the cause for petitioner. With him on the brief were *Robert T. McCracken, John R. McCullough* and *Frederick W. P. Lorenzen.*

By special leave of Court, *Thorley von Holst* argued the cause *pro se* and for the Skelly Oil Company et al., as *amici curiae,* urging affirmance. With him on the brief were *J. Bernhard Thiess, Sidney Neuman* and *Robert W. Poore.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner, Universal Oil Products Company, is a patent-holding and licensing company. In 1929 and 1931, it brought suits for infringement against the Winkler-Koch Engineering Co. and the Root Refining Company, respectively. The suits were consolidated, the validity of the patents sustained, and decrees for their infringement entered. 6 F. Supp. 763. The Circuit Court of Appeals for the Third Circuit, in an opinion by Judge J. Warren Davis, affirmed the decrees, 78 F. 2d 991, and this Court, in October, 1935, denied *certiorari. Root Refining Co.* v. *Universal Oil Products Co.,* 296 U. S. 626. Both before and after the decision in the *Root* case, Universal started similar infringement suits against other oil companies. Universal invoked the *Root* decisions as *res judicata* against some of these companies. It maintained that, although these companies had not been parties of record in the *Root* suit, they were members of a "patent club," to which Root belonged and which had been formed

to pool money for the defense of any member of the "club" in an infringement suit against it, and that the *Root* case had been defended by the attorneys for the "patent club." Universal contended that these circumstances made the other oil companies substantial parties to the *Root* litigation and as such bound by its outcome.

On June 2, 1941, during the pendency of these latter cases, attorneys who had represented Root and were representing the other oil companies advised the attorneys of the petitioner that on June 5, 1941, they would bring to the attention of the judges of the Third Circuit Court of Appeals the circumstances surrounding the appeal in the *Root* case, and, more particularly, the relations of one Morgan S. Kaufman to the outcome of that appeal, and invited petitioner's attorneys to attend. At the hearing on June 5, the moving attorneys suggested, in substance, that testimony taken at the trial of Judge Davis pointed to bribery of Judge Davis by Kaufman to secure a decision favorable to Universal in the *Root* appeal. They urged an investigation of the questionable features surrounding affirmance of the *Root* decree, but expressed doubt as to the capacity in which they could formally make such a request of the Court. Their difficulty was due to the fact that after this Court had denied *certiorari* in the *Root* case, Root had settled its controversy with Universal and was unwilling to disturb the agreement by an attempt to reopen the law suit. The other oil companies who were in litigation with Root insisted that they were neither formal nor substantial parties to the *Root* case. And so their attorneys, who were the attorneys in the *Root* litigation and the moving attorneys in the present proceedings, could not move on their behalf to have the *Root* decree vacated. But these other oil companies had an interest in the *Root* decree since it might be used in pending cases to their disadvantage. Universal offered

to consent to a reargument of the *Root* case and to preserve to the Root Company the benefits of the existing agreement, even if Universal should prevail upon reargument. Throughout these proceedings Universal stood ready to carry out this offer, but nothing ever came of it, presumably because Root was not represented at these hearings and the other oil companies were not parties of record in the original litigation.

The dilemma of the attorneys who initiated these proceedings to set aside a fraudulent judgment but could not speak for any client prepared to come before the court as a party in interest, was resolved by a suggestion from the presiding judge of the Circuit Court of Appeals. The suggestion was that the court would accept the services of these attorneys as *amici curiae*. Accordingly, they offered themselves in that role. Upon their acceptance as such by the court, they asked for the appointment of a master to investigate the *Root* appeal. While they thus proceeded as *amici* they stated quite candidly that they were also concerned with the interests of their clients, the oil companies in pending litigation. As a matter of law, however, their status was only that of *amici,* for their clients did not subject themselves to the court's jurisdiction. The relation of these lawyers to the court, after it recognized them as *amici,* remained throughout only that of *amici.*

A master was appointed and he conducted an extensive investigation. He examined records in the possession of the United States Attorney for the Southern District of New York, the records of proceedings before a Philadelphia grand jury, bank records, and various statements of interested parties. From this mass of material, he selected those documents which he deemed appropriate for submission to the inspection of the *amici* and of counsel for Universal. Witnesses were also heard and petitioner

was given the right to cross-examine. But the investigation was not governed by the customary rules of trial procedure. Petitioner's counsel duly excepted to the manner in which the investigation was being conducted, "if it were to involve any property rights of our clients, including the validity of any judgment . . ." The master evidently did not view the proceedings in the light of an adversary litigation. He ruled "that the investigation—for that is all it is—should [not] be conducted strictly according to the rules of evidence in litigation." At the conclusion of this investigation, the master rendered a report in which he concluded "that there was in connection with this case such fraud as tainted and invalidated the judgments" in the *Root* appeal.

On the basis of this conclusion, the Court of Appeals on June 15, 1944, entered an order directing that the judgments be vacated and the cause be reargued. The relief thus granted was that to which petitioner had consented before the investigation got under way. On July 24, 1944, the *amici* applied to the court below for an order directing that the expenses and compensation of the master be taxed against Universal. In view of the fact that Universal appeared and participated in the investigation before the master, with acquiescing knowledge that the master's fees and expenses would be assessed by the court, we do not disturb the taxation of the master's fees and expenses. The *amici* also asked the Court to assess against Universal their expenses and reasonable attorneys' fees. The court awarded $54,606.57 in expenses, part of which was for the amount they had advanced in payment to the master, and $100,000 as compensation for their services. These amounts had in fact already been paid to the attorneys by their oil company clients. The awards thus constituted an order for reimbursement of the clients by Universal. The case was heard by the court *en banc,*

and two of the judges thought that the *amici* were only entitled to a compensation of $25,000. 147 F. 2d 259. Questions of importance in judicial administration were obviously involved by the disposition below, and so we brought the case here. 324 U. S. 839.

The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question. *Hazel-Atlas Co.* v. *Hartford-Empire Co.*, 322 U. S. 238. The power to unearth such a fraud is the power to unearth it effectively. Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation. But if the rights of parties are to be adjudicated in such an investigation, the usual safeguards of adversary proceedings must be observed. No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties. Such is precisely a situation where "for dominating reasons of justice" a court may assess counsel fees as part of the taxable costs. *Sprague* v. *Ticonic National Bank,* 307 U. S. 161, 167. But, obviously, a court cannot deprive a successful party of his judgment without a proper hearing. This question is not before us, except as it bears on the order allowing attorneys' fees and costs. But if the judgment could not be nullified without adequate opportunity to be heard in a proper contest, neither is it just to assess the fees of attorneys and their expenses in conducting an investigation where petitioner throughout objected to the character of the investigation if it was to be used as a basis for adjudicating rights.

The case may readily be disposed of on a narrower ground. No doubt, a court that undertakes an investi-

gation of fraud upon it may avail itself, as did the court below, of *amici* to represent the public interest in the administration of justice. But compensation is not the normal reward of those who offer such services. After all, a federal court can always call on law officers of the United States to serve as *amici*. Here the *amici* also represented substantial private interests. Their clients were interested in vacating the *Root* judgment though they would not subject themselves to the court's jurisdiction and the hazards of an adverse determination. While the *amici* formally served the court, they were in fact in the pay of private clients. *Amici* selected by the court to vindicate its honor ordinarily ought not be in the service of those having private interests in the outcome. Certainly it is not consonant with that regard for fastidiousness which should govern a court of equity, to award fees and costs of *amici curiae* who have already been compensated by private clients so that these be reimbursed for what they voluntarily paid.

In No. 48, the judgment is reversed and remanded to the Circuit Court of Appeals for the entry of a judgment in conformity with this opinion.

In No. 64, the writ of *certiorari* invoked under § 262 of the Judicial Code, 28 U. S. C. § 377, is dismissed.

MR. JUSTICE BLACK concurs in the narrower ground of the opinion.

MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.